10-5-0-6-7, Samish Indian Nation against the United States. Don't worry about that. That's fine. Don't worry. Mr. Dorsey. Thank you, Your Honor. May it please the court, I want to first acknowledge we have three members of the Samish Tribal Council present today in the courtroom. Before I address the issues on appeal, I want to briefly summarize the background of this case. I know Judge Geisler was involved in the previous decision, sets the scene for the legal framework of this case. A federal government clerk in 1969. We're very familiar with the background, and I think probably, given the limited time, it makes sense just to charge right into the court. So the question in this case is whether, even though there is no question that the Samish tribe was wronged by the federal government in 1969 and after, the tribe has a remedy against the United States and the Court of Federal Claims. There are three primary issues in the current appeal based on the decision of the Court of Federal Claims. The first is whether the statute and regulations as interpreted and applied are money mandating so as to support the claims court jurisdiction against the United States. Well, the claims court found the Revenue Sharing Act was money mandating, right? That's correct. So on that point, you're focused instead on the Anti-Deficiency Act, and we believe the Judgment Claims Act applied instead. Could I ask you, if you don't mind, to jump to that point? I know it's sort of the last point in the process. I'm glad to do that. Well, so what exactly, I'll admit that it was a difficult concept for me to wrap my hands around. Based on some of the way it was argued, it seems like it would never apply, and based on the other way it was argued, it seems like it would always apply. So why don't you tell me when you think it would apply? I realize you think it doesn't in this situation, but tell me a rule that I would apply to be able to understand under what circumstances the government could rely upon this. On the Anti-Deficiency Act? Well, in the cases that the government cites and were relied on by the Court of Federal Claims, they involved injunctive relief under the Administrative Procedures Act. They didn't involve claims for damages in that setting because otherwise, you know, our argument is that a tribe or a claimant in any setting never has the right to claim damages once the appropriation year has passed. That would apply even in this case to a tribe that was clearly recognized and for some reason that was denied contracting or those funds under the TPA statute. So we think they're limited where those judgments, the appropriation applies, but we have a clear jurisdiction under the Tucker Act, either one, it's the same interpretation for all three, the Big Tucker Act, Little Tucker Act, Indian Tucker Act, that the Six-Year Statute of Limitations has to apply where you're seeking money damages in this kind of setting. So you think the Anti-Deficiency Act can never bar a damage award ever, as long as its claim is filed under the Tucker Act? No. In the other case, I would say is some of these appropriation statutes, there's clearly a hard cap or not to exceed language in those kinds of settings. When the Appropriations Act is exhausted, clearly there's no remedy or recovery there. But that's not really because of the Anti-Deficiency Act, is it? I've always understood the Anti-Deficiency Act to be simply telling an officer of the executive branch that you'd better not either obligate or spend money that hasn't been appropriated. That's correct, yes. But the cap cases seem to me to address a rather different problem, which is, has Congress said that no matter what, no more money than X amount is going to be used for this program? And that would suggest that whatever Congress may have said with respect to how, who's going to get money from this program, and regardless of how the executive branch may have bolloxed it up by sending money to the wrong people, anybody that comes in later is not going to be able to get any more because Congress has said this is the extent of the federal government's liability, starglow. Okay, why isn't this case a starglow type case under that analysis in light of, and I call your attention to section, this is a supplemental appendix 10 that I've been reading from, you're probably familiar with it generally, but section 1224B, which sets out the specific appropriations that are going into the trust fund under the RSA and then calculates the payments predicated on that maximum exposure it set forth in those numbers. Yeah, well we've been relying on the Cherokee Nation versus Thompson case, which just says that damages may be awarded out of the judgment fund when payment is not otherwise provided for. So we believe the judgment fund is available in these kinds of settings. But when there's a statutory cap and a specific earmark of funds, we've held that that general language of Cherokee Nation is inapplicable. I mean, Greenview County and the decision in Arctic Slope, which you're familiar with. So why doesn't that analysis, as opposed to Cherokee Nation, apply in this instance? Because there is no statutory cap for these TPA funds and the Appropriations Act for this particular program. Well the question would be, why doesn't this constitute, in effect, a statutory cap by saying this is the amount of money that's dedicated to this particular fund? Well, because that's the way the cases haven't interpreted it that way. For example, not in Arctic Slope, but in Cherokee Nation and the others, where there are other funds generally available, the fact that this particular program may have exceeded its limit or not doesn't mean that funds are not available for contract support in other circuits. So if you have, anytime, there is an appropriation, there is an amount set in it, anytime the fiscal year ends or all the funds are obligated, then a damage remedy would be eliminated and the statute of limitations in the Tucker Act would be useless, fruitless. You're certainly right that carried to that extreme, that would that would mean the Department of Transport, the Postal Service, wouldn't have to pay torque damages. That's right. All right, but this is seems to me to be at least possibly a different case in as much as we're talking about a specific creation of a discrete fund with effectively immunized from and isolated from the rest of the appropriations of the of the particular department. I'd agree with that. I think the case law has only applied it where there is this specific cap or not to exceed language and it hasn't been extended further. Okay. But does the not to exceed language really put the cap on it? Does that specific language have to be in the appropriation? Well, I think it can appear in other forms or guises as we're arguing, you know, language in the statute doesn't have to be expressed to create the money mandating obligation. The same thing I think there could be indications in the legislative history or agency practice or other things that would say clearly there is a cap kind of that is generally understood to exist. But I don't think there's anything in the record in this case. We have our affidavit declaration from James McDivitt who was intimately involved in this whole process who said, you know, the money was there to fund all recognized tribes and there was no exceptions to that. In fact, in this particular case we're talking about here where Congress wanted to alter the practice of contracting or providing funds to all recognized tribes it included language in the Appropriations Act either saying you can apply your own general assistance standard or you can apply, you can divert 10 percent of the funds for TPA to tribes that may have sufficient resources from gaming or other sources to get to underserved tribes. So there's been that kind of indication that would indicate here the opposite. Because that was a reallocation. Excuse me? Those are reallocation of funds, wasn't it? That was given the discretionary obligability to the Secretary of the Interior. Well, generally when there's a lump sum appropriation there's that kind of inference. But here you've got to apply the agency practice. One of the errors we think the lower court made is they didn't apply, it's the same legal principles apply to all versions of the Tucker Act. And in the non-Indian cases and you look at statutory interpretation you have to look at agency practice, things like Morton versus Ruiz. And here we have all these indications every year the Bureau of Indian Affairs submitted a list in their green budget book of every tribe that was going to get the funding, the approximate funding. And so this expectation built up that it wouldn't be reallocated. In fact, when there were supplemental appropriations acts, Congress specifically said there, because that was the kind of thing that we would think would be even more flexible, Congress specifically directed that it be provided proportionately to all of the tribes currently under contract. If we were to agree with you that the Revenue Sharing Act is money mandating and if we were also to find that the Anti-Deficiency Act doesn't provide an obstacle to recovery, do you still need us to address TPA? Is it a separate pool of money or would your measure of damages be the same regardless of which act you were entitled to coverage under? Well, it's a separate program. In this appeal we've kind of focused on TPA and revenue sharing because they are the easiest to make our arguments about. We had 38 statutes. It's a separate program but is it the same pool of money? It's the same pool of money. So if we were to decide one, would we have to decide the other? No, I don't believe so. I think the standards are different in terms of whether the Revenue Sharing Act has express language, the shell language. Oh, and it's an act. You know, TPA is a program and the government has some arguments. I'm curious to your response about, you know, this is not a source of law. It's a program. No, it is a program but it's also based in the Appropriations Act and this brings us back to as applied and interpreted. You have to look at the agency practice. You also have to look at related statutes like the Federally Recognized Tribes Act which talks about the obligation of the United States to all tribes. The amendments to the Indian Reorganization Act which say the U.S. shall not discriminate between tribes. But those aren't money mandating statutes. Not by themselves. It's the network scheme we were talking about. The Court of Federal Claims ruled that the tribe could only rely on the network scheme if there was a fiduciary or trust duty and a trust corpus. They ignored the fact that the courts have allowed a discretionary scheme and we cited a number of cases in non-Indian cases without having those two elements present. So we're clearly extending the law but we're attempting to apply the principles that are well understood and applied in this court to a new set of circumstances because this is a situation that hasn't existed before in terms of these federal programs. When you say the discretionary cases, you mean such as the Doe and McBride? Yeah, Agri Act and those kind of line of cases. And you look at it like the compensation representation for federal judges. The court had to look at representation of federal defendants generally and others. And also you have to come back, even though I'm aware that the court in its prior decision ruled that the Indian Self-Determination Act isn't money mandating by itself. When you look at the program and the money is appropriated, then the Indian Self-Determination Act says upon request of the tribe, the United States shall contract. So you have to apply this whole scheme and the agency practice and the understanding of Congress when it was enacting and appropriating this money. But then whether or not it allocates is based on agency discretion. The tribe doesn't automatically get it. The inference is there, but as our affidavit showed, in every year the agency has allocated the money that was requested. That can't be the standard, right? Because then the agency is going, even though they have absolute discretion. Suppose it wasn't an inference. Suppose that the program says the agency has complete and utter discretion to approve or not approve completely at its own discretion any amount of sum. The fact that they always gave you what you asked for doesn't overcome the fact that they had the discretion at any point they wanted to to stop giving it. Well, I don't know that they had that discretion in this case. As I say, there's an inference that the discretion is there. But you look at the old case of Morton versus Ruiz and general assistance. Again, there's no restrictions on general assistance in the Appropriations Act. But the US Supreme Court held that the agency was bound by its practice. It could not exclude Indians from general assistance who resided off reservation, even though there are no restrictions in the statute to that based on the fact that they had provided that type of assistance for years in the past and made representations to Congress. But Mr. Dorsey, your argument, though, is the fact that if the tribe had been federally recognized and continuously federally recognized, that they would have been included as part of that distribution. That's correct. Under the revenue sharing. Yes. And all the other statutes that we cited. Yes. You're well into your rebuttal time, but we'll save it for the full two minutes of rebuttal. Thank you very much to hear from Ms. Hanson. May it please the court. My name is Tecla Hanson Young, and I represent the United States. I have three points that I would like to make today. First, that the TPA system is not money mandating. Second, the Revenue Sharing Act is not money mandating. And third, even if it is found by this court to be money mandating, an award is barred here by the Anti-Deficiency Act and general principles of appropriations law. I'm going to address the Anti-Deficiency Act and the Revenue Sharing Act claims first, because that seems to be an area in which this court is particularly interested. If this court finds that the Revenue Sharing Act is, in fact, money mandating, the Court of Federal Claims would still not be authorized to award money damages in this case, because the Revenue Sharing Act, the appropriations for the Revenue Sharing Act were capped. The appropriations had lapsed well before the tribe brought this lawsuit, and the funds were, in fact, exhausted. I don't understand how confined or broad your argument is with respect to the Anti-Deficiency Act. Typically, any agency, the Department of Justice, the Department of Transportation, any agency has appropriated funds that at the end of the fiscal year lapse. And typically, lawsuits are brought after the end of the fiscal year. It would not be a violation, I think, of the Anti-Deficiency Act to obtain a judgment against an agency which had engaged in conduct that deprived somebody of money to which they were due, simply because the appropriated fund that should have been devoted to sending money to that person has lapsed, wouldn't it? The funds would have had to have lapsed and have been exhausted. Well, okay, when's the last time any agency didn't exhaust all its funds? You're not contending that the only time you get a judgment against an agency, surely, is when the agency has managed to save a few million dollars and it's still around. In that case, a claimant would have had to bring the lawsuit before the appropriations had lapsed or they were exhausted. And this court's precedent makes that clear. Are you sure that that's, I mean, that's a breathtakingly broad proposition, it seems to me, unless I'm not understanding what you're saying. Because we have, I mean, the judgment fund is out there to deal with claims against federal agencies that go back years where a payment should have been made and wasn't. And that somebody is saying, you know, I was injured by virtue of that payment not being made. I can't imagine that in any considerable portion of those cases, there is still money in some pot somewhere that can be, or could at least hypothetically be used to fund the award. That's not your position, is it? Well, I think an important point that your question is lacking is the fact that the appropriations were capped in this instance. Ah, now we're into another universe, it seems to me. But are you, let me ask the question this way, are you limiting your Anti-Deficiency Act claim to a situation in which there is capping and earmarking of the sort that we've discussed in cases such as Star Glow and Arctic Slope? I don't think so. And the reason why I say that, and that idea is- Well, then you take capping off the table then. So I did leave it out of my hypothetical, and I did so intentionally because I wanted to see if, in fact, your position didn't rely on capping. And now you're saying it does not rely on capping. It doesn't rely on capping because- So why isn't it breathtakingly broad? Why wouldn't it virtually read Tucker Act remedies out of existence? It wouldn't because this court's precedent has also recognized that where Congress doesn't actually appropriate funds or where there wasn't money, then it's permissible to recover under the judgment fund because funds are not otherwise provided for in that instance. So when there are insufficient funds, the Court of Federal Claims can still authorize an award of damages under the judgment fund. I don't think I understand your response. Can you try again? I don't think that it's an overly broad or expansive reading to say that a statute where the appropriations have lapsed and the funds have been exhausted results in the claimant's inability to bring a claim. So on December 31st, I get the letter in the mail, my claim has been denied, and instead they wrongly gave my money to someone else. Government on January 1st looks at me and says, you're right, boy, we sent it to that other Judge Kimberly Moore by mistake at the wrong address. Sorry, December 31st is now January 1st, new appropriation year. We gave the money to somebody else. No cause of action for you. You're out of luck. I think in that instance, the judgment fund might be available in that case. The claimant could not bring a claim under that. It's not just lapsed then and unavailable money. Because in the example I just gave you, the appropriation year lapsed and the money was given to someone else, so it wasn't still there to give to me. You're right. In that case, a remedy would be available through an alternate source of funding. The judgment fund. Suppose that you, yourself, were to be not paid for a given month and you sued in the Court of Federal Claims to get under the Back Pay Act, saying that I was denied funds that I was entitled to or I was given the wrong GS rating or something. And your suit finally got resolved two years after the end of the Department of Justice's fiscal year, in which the Department of Justice had spent all its money. You still win. Even though that money is coming, the money that was supposed to be paid to you was money that Congress had appropriated for the Department of Justice for that year, in which you weren't paid. And let me clarify. I think that would depend on the nature of the claim that I brought. If I brought an APA claim, I would not be able to recover. No, you wouldn't bring an APA claim because it can't be brought for damages. Right. You would bring a damages claim under the Back Pay Act in the Court of Federal Claims, and you would win, and you would get a judgment, right? And the Anti-Deficiency Act, if one of your colleagues at the Department of Justice raised the Anti-Deficiency Act, that claim of that defense would lose, correct? I think that's correct. And why? And why would that defense lose? Because the statute wasn't capped. Then we come back to the cap. Right. But a minute ago, you told me the cap was not critical to the Anti-Deficiency Act argument. Are you saying that it is critical? I think it's not critical to the Anti-Deficiency argument, depending on what kind of a claim that you are bringing. And I think this goes back to the nature of the tribe's claims here. The tribe brought two claims, or alleged two claims in its complaint. The first claim was a statutory violation, seeking money for violations of specific statutes. The second claim was a claim arising from a breach of trust. I think to the extent that the tribe is alleging a specific Bowen-type claim that should properly be brought in the district court, then the judgment fund, then the cap doesn't matter, and the Anti-Deficiency Act bars the claims because the appropriations have lapsed. To the extent that the tribe is bringing a claim seeking money in the court of federal claims, then I think the cap does become important under this court's precedent in Highland Falls, in Thompson v. Cherokee, Green Lake County. OK. Well, where's the cap in this case? Right. I think that's good to focus on where the cap is. The cap comes in several places in the statute. In the supplemental appendix on page 10, under appropriations, which is 1224B. Right. That's the section that Mr. Dorsey and I were discussing, right? Yes. What page are you on in the supplemental appendix 10? Essay 10. Under section B, Congress has appropriated a specific amount of funds to be allocated under the statute. And then if you look at the next section, 1225, and the following sections concerning allocation, you will find that the secretary is only authorized to allocate funds up to the amount appropriated. In other words, the secretary has the discretion to allocate funds among state and local governments, but only up to the amount that has been appropriated by Congress. Another element of the statute that indicates that the appropriations were capped is on supplemental appendix 11, under section C2, the last sentence. This section is talking about additional funds that can be appropriated in certain circumstances. And the last sentence states that if the amounts appropriate under this section are not sufficient to pay in full the additional amounts allocable under the subsection, the secretary shall reduce proportionately the amounts so allocable. Those two different provisions of the statute indicate that Congress clearly intended the secretary to not allocate any more money than what was appropriated. Is something capped anytime Congress gives a dollar amount for an appropriation? No, it's not capped. Congress has to explicitly indicate, or not explicitly indicate. Congress has to indicate that, whether through inference or explicitly, but it has to be in the statute that it did not intend for the agency to appropriate it. So just a dollar amount alone, even articulating particular dollar amounts in time periods, would not be enough to infer that Congress intended to cap? I don't think, I think that this court would have to look at the language surrounding the dollar amount and how the dollar amount was to be allocated in the other provisions of the statute. What in B exactly implies a cap as opposed to just articulating a dollar amount? Well, I think, I think B. B doesn't, right? B implies the dollar amount. Right, so what exact sentences do you think, I understand the one in C, the last sentence of C2, I have that part firmly in hand, but what other sentences precisely do you think limit the secretary and demonstrate that it's a cap? On supplemental appendix 10, under section 1225 B, that section discusses the amount that the secretary is authorized to allocate and the three-factor formula under B2 states that. Why isn't that just, okay, maybe I should let you finish, go ahead. That the amount allocable to a state under this paragraph for any entitlement period is the amount which bears the same ratio to 5,300,000,000 as the population, etc. And then that section goes on to explain that the secretary cannot allocate more. Where? If you read, it is complicated and it doesn't explicitly say that the secretary can't allocate more, it doesn't use those exact words. But if you look at the way that the secretary is authorized to allocate the amount, why isn't this just a formula? Why isn't this section 1225 simply, as it purports to be, the three-factor formula for purposes of allocating to individual states? Why isn't it just a formula that explains, okay, here's the money that we've appropriated. We already know just appropriating money doesn't necessarily mean cap. And here's the formula for how to divide it up. I mean, isn't... Even if you view this as simply a formula for how the secretary should divide up the money, the fact that the formula includes a specific limitation on that money, as opposed to simply saying... Where? Where's the specific limitation? The 5,300,000,000 is equal to the amount that was appropriated in section B. For A and B. Right. For January and July. Exactly. But is that a limitation or is that really an allocation limitation? It's a limitation on the amount that the secretary is authorized to allocate to the varying states and local governments. Well, you have the clause that says the secretary shall reduce proportionately the amount so allocable as an indication, I suppose, that Congress didn't intend to expose itself beyond the 5.3 billion. I guess that's what it is. What did you say you have beyond that? Did you have specific language elsewhere in the statute that suggests language of limitation? The typical cap language is not to exceed. Shall not exceed. Shall not exceed. Now, what language beside the section we pointed to and the fact that there is a certain amount that's specifically appropriated and it wasn't an open-ended appropriation, of course, as they typically are not. What other language is there? Well, I think in 1221, which is on supplemental appendix nine, this court could look at the language that states that each unit of local government is entitled to an amount equal to the amount that the secretary determines under this allocation scheme. So in other words, the allocation scheme used by the secretary determines the amount that should be awarded to each unit of local government. And if the amount that the secretary can allocate is limited by this total sum of money, then the secretary can't actually allocate any more than what was appropriated. But that would always be the case, though, wouldn't it? If the Congress authorizes five million dollars, for instance, to be allocated according to a formula, you're saying that because of that allocation formula, then there's a cap and a limitation which cannot be exceeded? I think because the allocation formula specifies a specific monetary amount that the secretary must use as the maximum amount of money when determining the ratios and the different factors that it should use in allocating the money. And then there's a separate section that indicates that each unit of local government is only entitled to the amount determined according to that ratio. Then the fact that the ratio imposes a limit means that the statute has been capped. The appropriations for the statute have been capped. I think it's fair to draw an inference from that. In addition to the other language on Supplemental Appendix 11, I think you could also look at the language on Supplemental Appendix 10 under 1224C. The last sentence there that the secretary shall from time to time transfer from the trust fund to the general fund, any monies which he determines will not be needed, I think that also envisions, I think that indicates that Congress envisioned that all the money wouldn't necessarily be used as opposed to indicating that this was a minimum amount. Now there's not just a cap, but there's also an instruction not to even use what we've all appropriated you? Yes, that's correct. And that's also, that's part of the reason why, that's one of the reasons why we argued that statute was not in fact money mandating, because the secretary did have the discretion not to use the funds that were allocated based on a determination that a certain unit of local government didn't need it. And if this, so this all what we've been discussing only applies if this court is defined that the Revenue Sharing Act is money mandating. On that question, if you could, and we're running over, so I just want to ask one quick question. I think it's a quick question. Do you believe that the D.C. Circuit's decision in National Association of Counties against Baker, which you've cited, do you think that that decision is in conflict with this court's decision in Agwiak? No, I don't think that it's in conflict, and there's a few reasons why. First is that Agwiak states, the statute at issue in Agwiak was very specific. It provided a specific amount of money to be paid upon certain conditions being met. This statute is unlike the statute at issue in Agwiak because this statute establishes a discretionary scheme that envisions the secretary can make allocations based on considerations of need, population, and a variety of other factors which allow the secretary some discretion. In fact, another court in the city of Newark versus Blumenthal has held that the secretary's allocation decisions are committed to its discretion. That's one reason why it's different. Are you talking about the TPA or are you talking about the Revenue Sharing Act? Revenue Sharing Act. Where is the discretion in the Revenue Sharing Act lodged in the statute? What's the best statutory referent for me to find the availability of freewheeling discretion on the secretary's part? Unfortunately, there's not just one. You would have to read several provisions together, but if you look at Supplemental Appendix 9, 1221-2, states that the secretary shall, for each entitlement period, pay out of the trust fund to each unit of local government a total amount equal to the unit of such unit as determined under Section 1227. And then if you look at it, it doesn't require, this part of the act doesn't require the secretary to pay out an exact sum of money. It only requires that the secretary pay out the amount that it determines it should allocate to the government or to the unit of local government. The act then gives the secretary discretion whether or not to allocate money to a unit of local government. And just because a unit of local government exists doesn't automatically entitle it to a payment under the Revenue Sharing Act. I thought that you told us earlier that the secretary didn't have discretion, but rather the statute explicitly told them to pay out the amount the formula determines should be paid. No, I'm sorry I gave you that impression. I didn't mean to say that.  And if you look at the 1983... Where does that discretion come from? Again, which section is it? The one that you were just talking about with Judge Bryson? 1221 and 1227. And then also Section 1224C on Supplemental Appendix 10. And that's in the earlier version of the statute. In the amended statute, it would be sections... But it talks about amount, under 1221 it talks about the amounts required to be paid. Wow. Required to be paid. Maybe I'm misreading it, but I read 1227 as calling for allocation based on a population formula. Population is one consideration, but the way that the secretary determines population is committed to its discretion. The way the secretary counts the number of people is a question of discretion? Right, it's based on... That's the discretion that is the basis for saying this isn't money mandate? That's one of the areas which... What are some of the others? Because that one didn't... There's a determination of need... Not much purchase with me. Whether or not there is a need... Those are just the criteria, and that exists for everything, right? Every person who makes under a certain amount of money, or every unemployed person, then there's some delegation, she'll get so much in unemployment compensation, there's a delegation to someone about who figures out, well, how hard did they have to work to figure out to get a new job, and how long have they been unemployed? There's always determinations that have to be made to apply. Could the secretary say, this year, Nebraska, you get nothing? I think that the secretary could not say that with respect to Nebraska necessarily, because the language with respect to states is different. Right. But within a unit of local government in Nebraska, I think the secretary could make that decision. But only if it determined that unit had no need, it didn't have adequate population, only if it followed the exact formula provided, and based on the criteria used to articulate that formula, concluded the person wasn't entitled. I think you're right that statutes always provide criteria, but simply because a statute provides criteria doesn't mean that it mandates payment in those circumstances. But if somebody meets that criteria, wouldn't it require the secretary to make that payment? No. Under the formula that the secretary has established? No, it wouldn't. And there's actually, I mean, the other section that I referred to on Supplemental Appendix 10, which is 1224C, which states that the secretary shall remove money from the fund when it I think that that supports a reading that the secretary can make determinations that money is not needed. And also, there is another provision in the statute which requires that local governments establish certain requirements according to the secretary's satisfaction, is what the language actually states, before they're even entitled to be considered for funding. And the language, the relevant language there would be under Supplemental Appendix 37, 6704. That's in the amended statute. It says, under regulations of the Secretary of the Treasury, a state government or unit of general local government qualifies for payment for an entitlement period only after establishing to the satisfaction of the secretary that, and then it lists a bunch of conditions. Once it does that, once it meets the secretary's standard, does the secretary have to provide them with the funds at that point? Under this, I would say no, it doesn't. I think I would say that the secretary can make a determination that there's no need to provide funding here. But that was not my question. If, in fact, the local unit of government meets all of the standards established by the secretary, including need and otherwise, does that local unit of government get the funds at that point? If the secretary makes an allocation to the local government, then the local government would be entitled to receive that allocation. I think that's correct. The secretary would be required to make that allocation. I don't think the secretary is required to make the allocation. But once the secretary makes the allocation, the secretary is required to pay it. Okay. All right. Thank you, Ms. Henson-Young. We'll hear any rebuttal from Mr. Dorsey. We'll give you your full two minutes, Mr. Dorsey. Thank you. I don't know if I'll need it or not. I have just two points I wanted to make. First, I misspoke briefly before. The TPA and the revenue sharing are two separate funds. TPA comes out of interior probes. I think revenue comes out of treasury probes. You asked for the distinctions I would make at the beginning of my argument about the Anti-Deficiency Act, too. One of the things I forgot to mention I would mention is that, and in some ways it's a theoretical exercise, but I think the Revenue Sharing Act discussion you had illustrates it a little bit, is we weren't asking, we aren't asking that the appropriation be expanded beyond the amount. What we were saying is we should have been a piece of the pie. So, for example, the Revenue Sharing Act says excess funds can be returned, but we would have met the formula under the appropriations that were actually made in the years in question. The same with TPA. You're not suggesting, of course, that we should enter, trial court should enter a judgment saying that everyone else cough up a proportionate amount of money in order to make up the shortfall that you're entitled to. And therefore, it would seem to me, you really are asking for an expansion of the total amount unless the total amount wasn't expended. Well, and that's why I say it's a little bit of a theoretical exercise. In the TPA- But in practical terms, you really are asking to go over the $5.3 billion, right? That's correct. Well, I'm not sure the whole $5.3 billion would have been used because- You want to make a bet on that? I don't know. Well, under the population criteria, though, the tribe would have been entitled to that proportionate percentage, which is sometimes sliced off the state. That's all. Thank you. We thank both counsel. The case is submitted.